## Case No. 6,332.

### The HELEN M. PIERCE.

[2 Hask. 205.] [1]

District Court, D. Maine. Dec., 1877.

SEAMAN'S WAGES—LOSS OF LIEN FOR—MINORS.

1. The mate and cook of a porgy steamer employed for the fishing season at stipulated wages have a maritime lien upon the vessel therefor.

[Cited in The Grace Darling, Case No. 5,651.]

2. A maritime lien for wages is not lost by taking the owner's note on time in settlement, when the circumstances rebut the presumption of payment and an intention to discharge the lien; or when fraud is practiced, or material facts are concealed by the owner.

3. In the absence of fraud or concealment of the true state of affairs, the taking of such note operates as an extension of the time of payment.

4. A minor, employed on such steamer by the master at all-work, has a lien for his wages, even though the owner is authorized by the sharesmen to retain from their shares his wages.

Libel in rem by the master and cook of a porgy steamer to recover their wages and the wages of the cook's son, who served at all-work aboard the vessel. The master was to serve during the fishing season for $600, and the cook for $60 per month, and the minor for $20 per month. The owner filed claim and answer, averring payment of the master and cook by his note to the master on ten months, and by his check to the cook payable at a future day, and that the lad had no lien for his wages. The cause was heard on libel, answer and proof.

Enoch Knight, for libellants.

Nathan Cleaves, Henry B. Cleaves, and Byron D. Verrill, for claimant.

FOX, District-Judge. This is a proceeding in rem, instituted by Isaac R. Coombs, the mate, and George Sampson, the cook, against the steamer Helen M. Pierce, to recover for their services on board said steamer during the fishing season of 1876, she having been engaged in porgy fishing on the cost of Maine. There is included in Sampson's claim the wages due his son, a minor of the age of sixteen years, for services on board said steamer during the entire season.

Luther Maddocks is the claimant of the vessel, and was sole owner, subject to certain mortgages; and she was wholly under his management and control, employed for his exclusive benefit. He contracted with Coombs, by written agreement, to employ him as mate of the steamer during the season for $600, commencing May 10th. $300 was payable August 15th, and the balance November 10, 1876. No question is made as to Coombs' performance of his part of the contract. On the third day of November, 1876, after the close of the fishing season, Coombs and Maddocks made an adjustment of their accounts as they had been kept by Maddocks.

The adjustment is in the handwriting of Maddocks and his clerk, as follows:

Mr. Isaac Coombs in Account with Luther Maddocks.

| | | | |
|---|---|---|---|
| Dr. | To cash $300 and Maddocks bill $34.69 | | $334 69 |
| | Note, 10 months from Nov. 3, 1876 | | 293 31 |
| | | | $628 00 |
| Cr. | By wages as per contract for fishing on H. M. Pierce | | $600 00 |
| | 16 days labor on boats and seine at $1.75 | | 28 00 |
| | | | $628 00 |

Settled Nov. 3, 1876, as above, for my service fishing on Str. H. M. Pierce.

Isaac Coombs.

It is claimed by Maddocks that by thus securing his note for $293.31, payable in six months with interest at eight per cent., Coombs discharged and released the lien which he previously had upon the steamer for his wages. There is some conflict of testimony as to what took place when the note was given. Coombs says, when he asked Maddocks to settle with him, "Maddocks said he could not pay me then, but would at close of ten months. I insisted on payment then; he urged me to take his note as he had no money to pay me, and I finally did take the note now produced and signed the settlement. Nothing was said about my releasing my claim on the steamer, and I never intended to do it." On cross examination he says: "Maddocks wanted me to lend him the money for ten months. I told him I could not, as I had no money. At this time I had for collection Maddocks' note to my brother for $100 which Maddocks then paid me. I had let my brother have $100 which he was to repay me if Maddocks did not pay his note. I had no interest in the $100 note, it was not indorsed to me. I had no knowledge of the financial condition of Maddocks at that time."

It appears that Luther Maddocks was then deeply insolvent, owing an immense amount; that he filed his petition in bankruptcy February 13, 1877, and has since effected a composition with his creditors at eight cents on the dollar. Maddocks' version of this interview is: "Coombs told me he had his brother's note and wanted it paid; I told him I was hard up and a good many fishermen had lent me their money for a year and I wanted him to do the same; that I had paid him considerable money and had lost heavily by the year's business; and he finally agreed, if I would pay his brother's note, he would loan me the money for ten months at eight per cent. interest." Sewall Maddocks, the brother and clerk of Luther, corroborates Luther's statement as to the matter.

Upon all the testimony I find the transaction to have been that Coombs received Maddocks' note for the balance due him, payable in ten months with eight per cent. interest, ignorant of Maddocks' insolvency and not intending to discharge any security for the payment which he before had. Maddocks, I

1 [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

find, must have been aware of his insolvency; and if, by this arrangement, he designed to defeat Coombs' security and palm off upon him his mere note for ten months, when he must have known there was not the least prospect of its being paid, he was contemplating a fraudulent practice upon Coombs, and attempted to accomplish a most dishonest purpose, which a court of admiralty will not permit.

In justice to Maddocks, I declare that I do not believe he was actuated by any such motive and purpose. I think all he in truth asked of Coombs, and all he expected to obtain, was an extension of credit for the ten months, and that at the time it did not occur to either party that the lien or security which Coombs then had would be affected by this extension of credit. Certainly, if Coombs had had the slightest suspicion of Maddocks' affairs, and that by taking the note he would discharge his lien on the vessel, he would never have entered into the arrangement; and, as I have before said, I cannot believe that Maddocks designed to defraud Coombs into a release of his security.

As between these parties, owner and seamen, under the circumstances here described, I hold that this note of the owner and claimant should be considered as a mere extension by Coombs of the time of payment of his lien claim on the vessel for ten months, with only the consequences which attend such an extension in a court of admiralty. It is to be remembered that the rights of third parties are not involved in this decision, as Maddocks, who was sole owner of the vessel when the services were performed, is the only claimant before the court, and we are therefore relieved from any questions which might have arisen, if a bona fide purchaser for value, since the note was given, had been claiming of the court protection of his rights.

In the case of The Canton [Case No. 2,388], Sprague, J., says: "There having been no change of ownership in this vessel, the position, that the lien has been lost by delay in enforcing it, is untenable, as no innocent third party is injured." The Paul Boggs [Id. 10,846], and The Eastern Star [Id. 4,254], are to the same effect.

In The Chusan [Id. 2,717], Mr. Justice Story says: "The lien, which is given by the maritime law on the ship, although it is or may be treated as a permanent or abiding lien on the ship until the debt is paid, as between the original owners and the material men and their personal representatives, is liable to a very different consideration when the ship has passed into the hands of a bona fide purchaser for a valuable consideration without notice of the lien. In respect to such a purchaser, the lien must be enforced within a reasonable time after the debt is due, and the credit, if any, has expired; otherwise, a court of admiralty will protect him, as a court of equity would do, against the claim as stale and inequitable."

Upon these authorities, it is certain, that as against Maddocks, this claim is not stale, and there is nothing inequitable in enforcing it against his property originally charged with a lien as security for its payment.

Should Coombs, by taking the note of Maddocks and thereby extending the term of credit, be held in a court of admiralty, under all the attending circumstances, to have received such an absolute payment of his debt as discharged the lien therefor on the vessel?

By the law of Maine, a negotiable note of a debtor, received in settlement of open account, is prima facie evidence of payment of the account. Judge Sprague, in Page v. Hubbard [Id. 10,663], thus states the law in Massachusetts, where the same presumption of payment by negotiable paper is the rule: "But suppose the creditor holds collateral security for the original debt, and afterwards takes a negotiable note, it is clear that by the jurisprudence of England and the other states, the creditor will not thereby lose the benefit of his collateral security, unless such was the intention of the parties; * * * in determining whether the creditor intended that the original contract should be annulled, the fact that he held collateral security for its performance is very material, and has so been considered by the courts of Massachusetts." These remarks were approved by the supreme court of the United States in The Kimball, 3 Wall. [70 U. S.] 37.

In Carter v. The Byzantium [Case No. 2,473], Mr. Justice Clifford, speaking of this rule of presumption of payment by the Maine and Massachusetts courts, says: "It is merely a presumption of fact, and may be controlled by circumstances indicating a contrary intention;" and on page 4, he cites with approval the language I before quoted of Judge Sprague.

In Hudson v. Bradley [Id. 6,833], Judge Clifford's language is: "Courts of justice here and in Maine adhere to this rule in cases where the party accepting the new evidence of the debtor's promise relinquishes no security for the payment of his debt; but whenever the contrary appears, the manifest tendency of the modern decisions is to regard this circumstance as affording strong evidence to rebut the prima facie presumption."

In the case of Moore v. Newbury [Id. 9,772], a libel for supplies to a steamer on which there was a lien, the account was settled and the bill accepted as follows: "Received payment by H. L. Newberry and J. R. Hugenin's note at thirty days." Judge Wilkins says:

"In cases of this description, the material man is not deprived of any of his remedies, except upon the most conclusive proof that exclusive credit has been given to other security than the owners, the master, or the ship. Looking to either of the former, to the exclusion of the latter, releases the lien; but in no case will either be released, except upon the clearest proof that such was

the intention of the parties. * * * It (the note) was but an extension of time for the accommodation of the master; and by taking it for that purpose, and for that purpose alone, there was no abandonment of the previous existing lien."

In the case of The Chusan, before cited, the libellants were material men in New York, furnishing copper to a Massachusetts vessel for which they had a lien. The copper bill was settled by the note of B., one of the owners, on six months, and on settling with the other owner, B charged him with his portion of the bill thus paid. It was held by Story, J., that the barque was not thereby relieved from the lien, but that the interests of all the owners in her were still liable therefor.

In the case of The Betsey and Rhoda [Case No. 1,366], Judge Ware examined this question. In a very full and able discussion by him of the rights of a seaman to assert his lien on a vessel, from the owners of which he had received their note on time in settlement of his wages, the learned judge in this opinion, says: "He (the seaman) was entitled to it (his pay) without delay, and he consented to receive the note upon the assurance that it was the most expeditious mode of obtaining it. The most that can be said is, that it may have suspended his right of suing out process until the note arrived at maturity, or until he surrendered it to the makers. To have given the act the effect of a waiver of his privilege and an extinction of the lien, it should, in the first place, have been distinctly stated to him that such would be the result; and as at present advised, my own opinion is, that the note should have been accompanied with some other security in addition to the personal liabilities of the owner as an equivalent and a compensation for the discharge of the lien."

As nothing of the nature of an equivalent here required by Judge Ware was given to the libellant, the case now presented for decision is identical with that decided by Judge Ware; and according to my knowledge of the practice in this district, it has ever since been ruled in accordance with the decision in The Betsey and Rhoda [supra]; and seamen have in repeated instances recovered their wages from the vessel, when they had received negotiable paper in settlement.

It is said, the payment by Maddocks to the libellant of his brother's note of $100 was a new and sufficient consideration for the release of the lien. The libellant had no interest in this note, he only held it for collection from Maddocks as agent for his brother, and Maddocks only did what he was legally bound to do, paying his own note when it was overdue. At the most, the libellant did not intend to discharge his lien, but only to give Maddocks a further credit of ten months. The payment of the $100 note was a consideration for such extension and nothing further.

If Maddocks is successful in thus defeating the lien, he would practice a fraud upon the libellant which the court ought not to permit. It was held by Judge Clifford in Baker v. Draper [Case No. 766], that although in Maine and Massachusetts the presumption is that negotiable paper is received in payment of the original debt, yet, "if there is any deception or fraud in the giving of the new security, or if it was accepted without a full knowledge of the facts, or under a misapprehension of the rights of the parties, the plaintiff or libellant, as the case may be, is not bound by the acceptance of the note, but may tender it back, or produce it at the trial to be cancelled, and seek his remedy on the original contract." The court held that the libellant must "understandingly and with a full knowledge of all the material facts accept the note in satisfaction and discharge of the parties to whom the original credit was given." In that case the libellants had received a note for supplies furnished by them to a vessel, from a person whom they supposed to be one of the owners of the vessel, but who had previously conveyed to a third party, as security for his liabilities, his interest in the vessel, which fact was not at the time known to the libellants. Judge Clifford ruled that the case was within the exception, and that there was no discharge of the original liability of those to whom the credit was given for want of a full knowledge of all the material facts.

It can not be pretended that Coombs received Maddocks' note with a full knowledge of all the material facts; but he was grossly deceived by Maddocks withholding the information of his insolvency, and that there was not the remotest possibility of his being able to collect the note at the expiration of the credit which he thereby obtained. If Maddocks at the time contemplated this fraud, and meant then to exonerate the steamer from this liability, of course he will not now be permitted to reap any advantage therefrom. If he was silent and did not contemplate this purpose, but permitted Coombs, in ignorance of the condition of his business affairs, to receive the note, the wrong is just as great to Coombs, and he suffers therefrom the same as he would if Maddocks had contemplated defrauding him and is thereby permitted to defeat Coombs' security for his debt.

In my opinion, Coombs did not intend to release and discharge his security by thus accepting Maddocks' note; and it is certain he would never have done it, if fully advised of Maddocks' condition; and if it were not for the exigencies which now surround Maddocks, I do not think he would ever have attempted, by this defense, to wrong Coombs out of his security for payment of his wages.

Sampson served as cook on this vessel under a written agreement for the season with Maddocks, at sixty dollars per month; about this branch of his claim, there is no contest.

but his son, only sixteen years of age, also served the entire season on the vessel as driver, who, I understand, is one of the crew, and who in a small row boat drives the fish into the seine after it is set. The boy, also, went as oarsman in other boats, sometimes steered the vessel and assisted in receiving on board the fish, and in discharging them at Boothbay. In fact, he did all kinds of work on board the vessel in the prosecution of the fishery that a boy of his age was capable of doing. His father testifies that at the time he contracted with Maddocks to serve as cook, it was agreed that the boy should serve on board at $20 per month. Maddocks denies any such agreement, and says he told Coombs that he would not hire the boy, but that afterwards the master told him he had hired him to assist the crew, who were mostly sharesmen, and that the crew would pay his wages from their snare of the catch, and that his wages, by an understanding between him and Coombs, were paid to Maddocks by the crew from their shares, and that he, Maddocks, is therefore indebted to Coombs for the boy's wages, but that there is no lien therefor.

I do not deem it necessary to determine which of these statements is correct, as in my view, on Maddocks' own statement that the master hired the boy, he having performed during the fishing season on board the vessel the services above stated, there was a lien for these services upon the vessel. The master had a right, with the sanction of the owner, thus to employ the boy; and the fact, that the owner was authorized to retain the amount to be paid for the services from the crew's portion of the catch, does not exonerate the vessel from liability. The lien is created by the service; and it would require the clearest and most precise testimony to satisfy a court of admiralty that for seamen's wages there was no lien upon the ship.

October twenty-eighth, Sampson received of Maddocks two checks drawn on a Bath Bank for $100 each in settlement of his claims, including his son's wages. These checks were payable December first, and January first, and it is admitted that it was the understanding of the parties that they were not to be presented to the bank for payment, and that Maddocks was without funds to meet them when they became payable. These checks were therefore merely evidence of Maddocks' indebtment to Sampson, and fall within the rule before given.

It is intimated that in porgy fishing there is no lien for seaman's wages. It appears that in this business there are two classes of seamen employed; sharesmen, who receive for their service a certain proportion of the catch, and a second class of men, who are hired at fixed rates of wages, either by the month or for the season. These steamers are employed cruising for fish off this coast, sometimes 30 to 50 miles from the shore, following the fish, which are found in large schools and taken in seines. The steamboats generally return to the shore at night and discharge their catch, starting again early the next day. It is unnecessary to determine whether sharesmen have or not any lien on the vessel for their services, as each of the libellants were to be paid a fixed definite sum for their services on this steamer, which were as clearly maritime, as though they had been rendered in a voyage to Cuba, and being thus maritime, a lien on the vessel attended them.

Decree for libellants with costs.